**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 15-cr-336-7-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**7.    RICHARD AVILA,**

      Defendants.

---

## ORDER ON *JAMES* PROFFER

---

In this drug distribution case, ten co-defendants were charged by a Superseding Indictment with conspiracy to distribute, and to possess with the intent to distribute, methamphetamine, in violation fo 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) & 846. (ECF No. 62.)  Of those ten defendants, eight have pled guilty to one or more charges, while one remains a fugitive.  Only one Defendant, Richard Avila (here, "Defendant," or "Mr. Avila"), now remains set to proceed to trial.  In addition to the conspiracy charged in Count 1, he is charged in Count 8 with possession and distribution of methamphetamine, on or about October 15, 2015.  (*Id.* at 4.)  The remaining 23 counts of the Superseding Indictment are not charged against Mr. Avila.

Now before the Court is Defendant's Motion for Production of Co-Conspirator Statements and Request for a *James* Hearing.  (ECF No. 248.)  In response to this motion, the Government provided a *James* proffer listing 138 statements the Government indicates it will seek to offer at trial under the co-conspirator statements

exception to the rule against hearsay, Federal Rule of Evidence 801(d)(2)(E).  (ECF No.

257-1.)  The Government also filed a brief in support of this proffer (ECF No. 257), to

which Defendant has replied (ECF No. 283).  Given this record, the Court's rulings

regarding the provisional admissibility of these statements under Rule 801(d)(2)(E) are

set out below.

## I.  NO HEARING NECESSARY

A district court can "only admit co-conspirator statements if it holds a *James*

hearing or conditions admission on forthcoming proof of a predicate conspiracy through

trial testimony or other evidence."  *United States v. Townley*, 472 F.3d 1267, 1273 (10th

Cir. 2007) (internal quotation marks omitted).[1]  Therefore, although a hearing is not

required, the Tenth Circuit has expressed a "strong preference" for pretrial *James*

proceedings.  *Id.*[2]  The reason is that if a court provisionally admits a statement with

_____

[1] The practice surrounding Rule 801(d)(2)(E) embodies what is commonly referred to as a *James* determination, which gets its name from *United States v. James*, where the Fifth Circuit held that a declaration by one defendant is admissible against other defendants only when there is a "sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy."  590 F.2d 575, 581 (5th Cir. 1979).  The Court at times employs the *James* terminology in this Order, in accordance with common practice.  But, ultimately, admissibility of the co-conspirator statements is governed by Rule 801(d)(2)(E).

[2] The Tenth Circuit has recently described *Townley* as "noting [the] circuit's strong preference for *James* hearings."  *United States v. Alcorta*, 853 F.3d 1123, 1138 (10th Cir. 2017).  However, *Townley* referenced a "preference for *James proceedings*," not "hearings." *Townley*, 472 F.3d at 1273 (quoting *United States v. Gonzalez-Montoya*, 161 F.3d 643, 648 (10th Cir. 1998)) (emphasis added).  In any event, the Court is unaware of any controlling authority holding that an in-court, pretrial evidentiary hearing is required, particularly where, as here, the Court determines that the preliminary findings can be adequately addressed based on written submissions (effectively a "hearing on the papers") and where the Court takes other steps (as ordered below) to ensure that the jury is not prejudiced by the improper introduction of evidence for which the Government then fails to establish the predicates of admissibility under Rule 801(d)(2)(E).  *See United States v. Rutland*, 705 F.3d 1238, 1248 n.2 (10th Cir. 2013); *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994).

the caveat that the Government "connect up" the statement to sufficient evidence of a predicate conspiracy at trial, the risk of prejudice to the defendants is high should the Government then fail to meet this burden. *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994). However, whether to hold a *James* hearing rests within the Court's discretion. *Id*.

The Court has reviewed the Government's proffer, the parties' briefing, and materials before the Court. Given the extensive nature of the proffer, the other facts and evidence of record before the Court, and the Court's findings below, a hearing is not necessary here. Moreover, since the Court reserves ruling as to the ultimate admissibility of evidence and makes no determinations here on any grounds other than Rule 801(d)(2)(E), the Government should introduce as much independently admissible evidence as possible to establish the predicate conspiracy before offering any statements under Rule 801(d)(2)(E).

## II. LEGAL STANDARD

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is "not hearsay" if it "is offered against an opposing party" and it "was made by the party's coconspirator during and in furtherance of the conspiracy." However, "[b]efore admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137; *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

Whether this standard is satisfied is a "preliminary question about whether . . . evidence is admissible," meaning the Court "is not bound by evidence rules, except those on privilege," when resolving the question. Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 178–79. As the offering party, the Government bears the burden of showing the preliminary facts by a preponderance of the evidence. *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (*en banc*).

"The court may consider both independent evidence and the statements themselves when making this finding." *Rutland*, 705 F.3d at 1248; *see also Bourjaily,* 483 U.S. at 180 ("a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy"). The Tenth Circuit requires "at most that there be some independent evidence linking the defendant to the conspiracy." *Alcorta*, 853 F.3d at 1142; *see also United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993) ("most courts require some reliable corroborating evidence apart from the coconspirator's statements before those statements may be used"). However, the independent evidence "need not be 'substantial.'" *Alcorta*, 853 F.3d at 142.

### III.  FINDINGS AND ANALYSIS

The Government has proffered 138 "statements" that it represents it will seek to admit at trial as co-conspirator statements under Rule 801(d)(2)(E). (ECF No. 257-1.) The Court's rulings and analysis here address only the provisional admissibility of these statements under Rule 801(d)(2)(E), subject to the Government "connecting up" these statements with evidence at trial of the predicate conspiracy. *See United States v.*

4

*Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).

The Government's briefing states both that its *James* proffer "generally does not include statements that the government intends to offer . . . under rules other than Rule 801(d)(2)(E)," and also that "some of the statements . . . are also admissible under alternate theories." (ECF No. 257 at 2.) These contradictory representations leave the Court unsure whether any determination under Rule 801(d)(2)(E) is necessary as to some unspecified part of the Government's proffer. In the Court's view, many of the proffered statements would be more naturally offered on some other evidentiary basis. Given the Tenth Circuit's admonition that "Rule 801(d)(2)(E) is a *limitation* on the admissibility of co-conspirators' statements that is meant to be taken seriously," *Perez*, 989 F.2d at 1578 (emphasis in original), and the potential for prejudice arising from unnecessary admission of evidence under Rule 801(d)(2)(E), see *Urena*, 27 F. 3d at 1491, the Court is reluctant to admit evidence under Rule 801(d)(2)(E) unnecessarily. Accordingly, and in light of the Court's reservation of ruling below, *see* Part III.C.2.b., this Order does **not** address admissibility (or lack thereof) on any grounds *other than* Rule 801(d)(2)(E).

## A. Existence of a Conspiracy

As to the threshold question of whether a conspiracy existed, the Court readily finds the Government has discharged its burden. To prove that a conspiracy existed the Government must show: (1) two or more persons agreed to violate the law, (2) the defendants knew the essential objectives of the conspiracy, (3) the defendants knowingly and voluntarily participated in the conspiracy, and (4) the alleged

co-conspirators were interdependent.  *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005).

To prove knowledge of the essential objectives of a conspiracy, the Government does not have to show a defendant knew all the details or all of the members of the conspiracy.  *Id.*  "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged co-conspirators."  *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (citing *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992).  "The core of a conspiracy is an agreement to commit an unlawful act."  *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991).  In this context, the element of illegality can be established from the proffered co-conspirator statements.  *United States v. Martínez*, 825 F.2d 1451, 1452 (10th Cir. 1987).  Direct evidence of a conspiracy is not required, and the conspiracy may be inferred from circumstantial evidence.  *United States. v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986) (citations omitted).  It is also not required for every conspirator to "know of the . . . full extent of the conspiracy [as long as he has] a general awareness of both the scope and the objective of the enterprise."  *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999) (brackets in original).

Applying these standards and the applicable burdens in this posture, the Government has met its burden of establishing that the defendants in this case were engaged in a conspiracy to distribute methamphetamine.  Co-Defendant Eden Murillo was arrested on July 24, 2015 and charged with possession of methamphetamine with intent to distribute and firearms charges, based on drugs and guns found in a search of

his residence.  (*See* ECF Nos. 1–4; ECF No. 257 ¶ 25; ECF No. 192 ¶ 25.)  While detained awaiting trial, Mr. Murillo placed phone calls from the facilities where he was detained to several of the other co-conspirators.  These calls were recorded.   A majority of the Government's *James* proffer constitutes recordings of Mr. Murillo's "jailhouse" telephone conversations with several co-defendants while detained.  (ECF No. 257-1.)  In particular, Mr. Murillo placed calls to co-defendants in the Denver area including his wife, Mandee Murillo, two of Mr. Avila's daughters, Krenshaw and Raquel Avila, and to Tanya Lindelien, who had been living with Mr. Murillo, and is also the mother of one of Mr. Avila's children.  (ECF No. 257 ¶¶ 26–27; ECF No. 192 ¶¶ 19–20.)

In these jailhouse calls, Mr. Murillo directed the other co-Defendants and made arrangements for them to acquire methamphetamine to carry on his methamphetamine distribution operation in Colorado.  Mr. Murillo also spoke by phone to co-Defendant Jesus Zamora Torres, who was the conspiracy's primary supplier of methamphetamine, in Arizona.  Mr. Murillo arranged for Mr. Zamora Torres to have various of the co-Defendants acquire methamphetamine in Arizona and to transport it from Arizona to Colorado.  (*See, e.g.*, ECF No. 257-1 Nos. 8, 10, 11, 37, 42, 44, 47–48, 57, 89.)  As the result of the activities carried out while Mr. Murillo was detained, and largely at his direction, the remainder of the co-defendants were charged in the Superseding Indictment on June 8, 2016, nearly a year after the original charges were filed against Mr. Murillo.  (ECF No. 62.)

Given the ample evidentiary record tending to establish the above facts, the Court finds the Government has discharged its burden of showing by a preponderance of the evidence that this conspiracy to distribute methamphetamine existed.  Defendant

does not truly argue otherwise, instead contesting that the evidence fails to show that he was a part of this conspiracy.

## B.     Defendant's Participation in Conspiracy

Defendant points out—correctly—that only a small minority of the Government's proffered statements make any mention of him whatsoever.  Nevertheless, the Court finds the proffered evidence reflecting Mr. Avila's connection with the conspiracy sufficient to make the preliminary showing required in this *James* determination.

Statements included in the Government's proffer and other evidence tending to show that Defendant was a member of the conspiracy include the following:

- On August 5, 2015, shortly after his arrest, in the same conversation when Eden Murillo communicated with Raquel Avila about connecting with Mr. Zamora Torres in Arizona, Mr. Murillo also said that he was trying to help out Raquel's father, Mr. Avila.  (ECF No. 251-1 #13.)

- After more conversations in which Mr. Murillo communicated with Raquel Avila about the methamphetamine in her possession (*id.* ## 16–17), on August 8, 2015, Mr. Murillo told her he was "building a team," and asked "what's up with your dad" (*i.e.*, Mr. Avila) (*id.* #18).

- On September 17, 2015, in another conversation where methamphetamine distribution was discussed, Mr. Murillo asked Raquel Avila, "did you talk to your pops," and told her to relay to Defendant the message that Mr. Murillo wanted him to "step up."  This call also addressed conflicts between Mr. Avila, Raquel Avila, and Ms. Lindelien. Mr. Murillo indicated he wanted these co-Defendants to resolve their disputes.  (*Id.* #53.)

- On September 28, 2015, Mr. Murillo called Ms. Lindelien, who assured him she was working with Mr. Zamora Torres to obtain methamphetamine.  In the same conversation, she informed Mr. Murillo that Mr. Avila was "about to go work."  (*Id.* #67.)

- On October 15, 2015, Ms. Lindelien and co-defendant Brigitte Saldana-Rea sold 4 ounces of methamphetamine to an undercover law enforcement agent, and the Government alleges Mr. Avila coordinated

this sale. (ECF No. 257 ¶ 32.) The evidence tends to show Mr. Avila was involved in facilitating this transaction. (*Id.* #71; *see also* ECF No. 398 ¶ 19; ECF No. 387 ¶ 23.) Notably, Ms. Saldana-Rea has entered a guilty plea regarding this transaction and is expected to testify at trial. Her testimony of record is that an unindicted methamphetamine supplier told her to meet with Mr. Avila to complete this transaction, but that Mr. Avila then directed her to meet with Ms. Lindelein instead. (ECF No. 387 ¶ 23; ECF No. 351-1.)[3]

- In a recorded conversation with the Government's undercover agent on November 12, 2015, when discussing whether Ms. Lindelien was ready to go ahead with methamphetamine sales, she told the undercover agent that she didn't know whether or not she was ready and would need to call Mr. Avila. (*Id.* #79.)

- In a call on December 27, 2015, in which Mr. Murillo and Ms. Lindelien otherwise discussed methamphetamine distribution, Ms. Lindelien said that Mr. Avila, and Krenshaw Avila, "burned me for . . . four and a half," evidently referring to a debt or failure to pay for drugs she had provided to them for distribution. (*Id.* #110.)

- On December 28, 2015, Mr. Murillo and Ms. Lindelien discussed her attempts to obtain more methamphetamine for distribution from Mr. Zamora Torres, and Mr. Murillo asked, "Are your ends right" (evidently referring to collections or debts), to which Ms. Lindelien reiterated that Mr. Avila owed her money. (*Id.* #113.)

- On January 2, 2016, Ms. Lindelien informed Mr. Murillo that she was facing eviction, repeating that Mr. Avila "owes me like three grand," and that she had told him to pay the landlord the money he owed to Ms. Lindelien." (*Id.* #119.) Mr. Murillo told her "Please clean that up," and suggested she "[t]ell [Mr. Avila] to go with you" on an anticipated trip to Phoenix to obtain methamphetamine. (*Id.*.)

_____

[3] The Court anticipates Ms. Saldana-Rea's trial testimony will be consistent with that offered at her change of plea hearing, including that she "received a phone call [from an un-indicted drug supplier] that Richard Avila would be showing up at the motel . . . to pick up four ounces of meth. And then later on I received a phone call . .. from Richard Avila telling me that [Ms. Lindelien] would be going instead of him," or that "he would be sending [Ms. Lindelien] instead." Although the court reporter's transcript of this proceeding has not been docketed, the Court has access to and relies on the court reporter's unofficial draft, as well as the Court's own recollection of the statements at the hearing.

- On January 4, 2016, in discussing the anticipated trip to Phoenix, Ms. Lindelien told Mr. Murillo that she had told the suppliers in Phoenix "I'm gonna be shy three [thousand dollars]" because of the money owed by Mr. Avila. (*Id.* #120.)

- Following additional communications with the undercover agent in early February 2016 regarding prices, quantities, and expected acquisition of methamphetamine (*id.* ## 123–28), Ms. Lindelien again informed the undercover agent that Mr. Avila "dipped on four grand." (*Id.* #129.)

- In February 2016, co-Defendant Navidad Sanchez—who law enforcement had previously observed making repeated trips from Phoenix to Denver and suspected was transporting drugs—was observed driving directly from Phoenix to Mr. Avila's residence. Surveillance saw Defendant and Navidad Sanchez meet in the driveway, after which Mr. Navidad Sanchez backed his vehicle up to Defendant's backyard, driving away shortly thereafter, proceeding to Ms. Lindelien's residence, then driving directly back to Phoenix. (ECF No. 369 ¶ 5.)

- On March 4, 2016, Mr. Navidad Sanchez texted Defendant, asking "Richard, do you need anything? O not this time?" Defendant responded "Yed i will need," and Mr. Navidad Sanchez responded "Okay I see you on morning, be ready." (ECF No. 257-1 #138 (as in original).)

- Mr. Navidad Sanchez left Phoenix the next day, March 5, 2016, and was stopped by law enforcement in Pueblo, Colorado on March 6, 2016. Four pounds of methamphetamine were found in the truck of his car, divided into a one pound block on one side and three pounds on the other side. (ECF No. 369 at 5, ¶ 6; *see also generally* ECF Nos. 357, 357-1, 357-2, 357-3.)

- In advance of Mr. Navidad Sanchez's trip from Phoenix on March 5–6, 2016, Ms. Lindelien had communicated with the undercover agent regarding a potential additional sale of methamphetamine, texting the agent on March 3, 2016, "I'm bringing 1 up are you ready . . . [f]or that or no." (ECF No. 257-1 #134.) The same day, Ms. Lindelien told the undercover agent, "[m]y person, he has to come out here for something else . . . that way we can get that one cheaper for you * * * he said he has to come up here for other reasons but he said he'd bring me one right now." (*Id.* # 137.)

- Given these communications, the Government alleges that one pound of the methamphetamine found in Mr. Navidad Sanchez's vehicle on March 6, 2016 was destined for Ms. Lindelien, while the other three pounds were destined for Mr. Avila. (ECF No. 369 at 5, ¶ 6.)

Viewing this evidence as a whole, and applying the standards applicable to the Court's preliminary determinations here, the Government has met the burden of showing by a preponderance of the evidence that Defendant was a participant in the conspiracy charged in Count 1 of the Superseding Indictment.

Defendant protests that the Government's proffer "twists and stretches the words of others," that "there is little to no evidence to support his participation or involvement" in the conspiracy, and that when understood in context, the Government is misinterpreting proffered statements which were unrelated to any illegal activity.  (*See* ECF No. 283 at 2, 4.)  For example, with respect to conversations between Mr. Murillo and Raquel Avila, Defendant argues they "demonstrate nothing more than a spat between a father and daughter," and show "that Mr. Avila and Raquel were not even speaking to one another" at the time.  (ECF No. 283 at 10.)  Likewise, Defendant argues that other statements in the Government's proffer relate to personal disputes between Mr. Avila, his daughters, Ms. Lindelien (the mother of one of his children), and Mr. Murillo (then in a relationship with Ms. Lindelien), and have nothing to do with drug distribution.  (*See* ECF No. 283 at 13.)  And, Defendant argues that the references to money he owed to Ms. Lindelien were "related to payment for rent," not for any drug-related debts.  (*Id.*)

Defendant's explanations for the proffered communications, might, if accepted by a jury, tend to defeat the Government's evidence at trial.  However, viewing the record as a whole under the standards applicable here, it is more likely than not that Defendant was involved in the conspiracy to distribute methamphetamine.  The proffered communications arose in the context of conversations that were

predominantly discussing methamphetamine distribution.  It is more likely that the relevant statements—such as Mr. Murillo "building a team," representing that Defendant was "about to go work," or regarding thousands of dollars owed to Ms. Lindelien because he "burned me"—related to drug sales than to unrelated matters.

Moreover, Defendant's communications connected to the October 15, 2015 methamphetamine sale, his February 2016 contact with Mr. Navidad Sanchez, and his communications with Mr. Navidad Sanchez immediately preceding seizure of the methamphetamine in Mr. Navidad Sanchez's vehicle undermine Defendant's contention that he had no connection to the methamphetamine conspiracy.  Although he correctly argues that "[m]ere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy" (ECF No. 283 at 11 (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)), the Court finds that the Government has discharged its burden to show that Mr. Avila participated in the conspiracy.

## C.    Provisional Admissibility—Statements in the Course and in Furtherance of the Conspiracy

The remaining prerequisites for admissibility under Rule 801(d)(2)(E) are that the statements "were made [1] in the course of and [2] in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137.

### 1.    Legal Principles

"A co-conspirator statement is made 'during the course' of the conspiracy if it is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (internal quotation marks omitted); *see also Krulewitch v.*

*United States*, 336 U.S. 440, 442–43 (1949) (holding that a declaration made after the conspiracy's "objectives either had failed or had been achieved" was inadmissible because it was not made during and in furtherance of the conspiracy). Statements made by co-conspirators during the conspiracy are admissible against a defendant who subsequently joins the conspiracy. *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991). However, to avoid improperly broadening the scope of conspiracy prosecutions, the Court "must carefully ascertain the nature and extent of a conspiracy in determining whether acts or statements can properly be viewed as made during its existence." *Perez*, 989 F.2d at 1579.

"[T]he in-furtherance requirement . . . embodies the [Rule] drafters' desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *Alcorta*, 853 F.3d at 1137 (quoting *Perez*, 989 F.2d at 1578). "A wide array of statements can fit this requirement." *Id.* "Examples of statements which may be found to satisfy the 'in furtherance' requirement include statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities." *Perez*, 989 F.2d at 1478. On the other hand, "statements are not in furtherance of the

conspiracy if they are mere narratives, that is statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." *Id.* at 1578 (internal quotation marks omitted).

Notably, the Tenth Circuit calls for "a construction of the 'in furtherance' requirement protective of defendants," and applies this test "narrowly." *Perez*, 989 F.2d at 1478. The focus is "on the declarant's intent in making the statement," rather than on the statement's effect. *Id.* However, "[n]o talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy. To the contrary, this determination must be made by examining the context in which the challenged statement was made." *Id.* at 1578–79.[4]

2. <u>Application</u>

The Court first addresses the statements which mention Mr. Avila, then those that do not.

a. *Statements Related to Mr. Avila*

In the Court's review (and based on the parties' briefing), only 15 of the 138 proffered statements mention or on their face relate to Mr. Avila. The Court generally

---

[4] The Government's briefing argues for a broader interpretation of the "in furtherance of" requirement. (*See* ECF No. 257 at 6–8.) The Court finds the Government's argument does not properly reflect the law in the Tenth Circuit. Many of the cases cited are from other circuits, and most precede *Perez*, in which the Tenth Circuit, sitting *en banc*, directly addressed the scope of this analysis, stating the requirement should be applied narrowly and in a manner protective of defendants. In the Court's view, the Government's sweeping interpretation of the "in furtherance" analysis is contrary to the teachings of *Perez*.

finds these statements were made in the course of and in furtherance of the charged conspiracy, and they are therefore provisionally admissible under Rule 801(d)(2)(E), as follows.

Statements 13, 18, 52, 53, and 67: These proffered statements reflect efforts, beginning August 5, 2015, to recruit Mr. Avila into the conspiracy, to placate disagreements between himself and other members of the conspiracy, and to confirm Mr. Avila's participation in the conspiracy. These culminate in Ms. Lindelien's representation on September 28, 2015 that Mr. Avila was "about to go work." (*See* ECF No. 257-1 ## 13, 18, 52, 52, 67.) Since Mr. Avila was implicated in the sale of methamphetamine with other co-conspirators shortly thereafter, on October 15, 2015, the Court finds these statements reflect a successful attempt to recruit Mr. Avila and were therefore made in the course of and in furtherance of the conspiracy, even assuming Mr. Avila did not join the conspiracy until approximately September 28, 2015. *See Brown*, 943 F.2d at 1255.

Statement 71: Proffered statement 71 summarizes multiple recorded phone calls and video and audio recordings documenting the October 15, 2015 methamphetamine sale charged in Count 8. (ECF No. 257-1 at 74–75.) This evidence tends to show that Ms. Lindelien and Ms. Saldana-Rea sold methamphetamine to the undercover agent, and that Mr. Avila played a role in this sale, including by directing Ms. Saldana-Rea to meet with Ms. Lindelien and by providing Ms. Lindelien the location of the sale. The Court finds the actions comprising the October 15, 2015 methamphetamine sale were undertaken in the course and in furtherance of the conspiracy.

15

However, the Government's proffer of the multiple recorded calls, audio, and video materials documenting these actions is too general to permit any meaningful pretrial rulings regarding admissibility of this "statement" as a whole. The Court is also unconvinced that these recordings will be best offered and analyzed under Rule 801(d)(2)(E). Much of this material is presumably not hearsay at all, while other portions may be admissible on other grounds.

Accordingly, the Court defers ruling as to the admissibility of any part of these materials under Rule 801(d)(2)(E), while noting that any *true* co-conspirator statements made in connection with the October 15, 2015 transaction which are not admitted on other, simpler evidentiary grounds will likely be admissible under Rule 801(d)(2)(E) following a predicate showing by the Government.

Statement 79: This recording of Ms. Lindelien telling the undercover agent she would need to call Mr. Avila before being ready to go ahead with a methamphetamine sale was made in the course and in furtherance of the conspiracy, and is provisionally admissible under Rule 801(d)(2)(E), although the Court remains skeptical that this is the best or only way to seek admission of a recorded phone conversation involving a law enforcement agent who will testify at trial.

Statements 110, 112, 113, 116, 119, 120, and 129: These additional recorded conversations describe in various ways the debt allegedly owed to Ms. Lindelien by Mr. Avila for drugs, and the consequences of that debt on the conspiracy's ability to operate, including to obtain additional methamphetamine. The Court finds these statements were made in the course and in furtherance of the conspiracy and, to the extent they are not more logically admissible on some other basis, these statements are

16

provisionally admissible under Rule 801(d)(2)(E).

Statement 138: These text messages transmitted between Mr. Avila and

Mr.Navidad Sanchez on March 4, 2016 immediately precede Mr. Navidad Sanchez's

departure from Arizona in a car containing methamphetamine.  They were made in the

course and in furtherance of the conspiracy.  If not more readily admissible on some

other basis, these statements are also provisionally admissible under Rule 801(d)(2)(E).

As to all of the statements addressed above, the Court rejects Defendant's

argument that the Government has insufficiently specified start and end dates of the

conspiracy, or when it was joined by various conspirators.  The evidence is sufficient to

show that the conspiracy was underway and ongoing at the time each of these

statements was made.  Likewise, the Court rejects Defendant's argument that the

statements pertaining to him were not made in furtherance of the conspiracy.

Consistent with the Court's review of the relevant evidence, *supra*, Part III.B., the

Government has made the necessary showing under Rule 801(d)(2)(E) that these

statements were made to advance the conspiracy's goals.  *See Alcorta*, 853 F.3d at

1137 ("A wide array of statements can fit this requirement").

> b. *Statements Not Related to Mr. Avila*

The remainder of the Government's *James* proffer includes statements by other

co-conspirators which do not mention Mr. Avila and do not relate to his alleged

participation in the conspiracy.  This is understandable, since at the time the Government

filed its *James* proffer on March 3, 2017, nine defendants remained in this case,

including among others, Ms. Lindelien, Mandee Murillo, and Raquel Avila, all of whom

are among those most directly implicated in the bulk of the Government's *James* proffer.

Since then, however, all defendants other than Mr. Navidad Sanchez (who remains a fugitive) and Mr. Avila have entered guilty pleas, leaving this case set for trial only against Mr. Avila. As a practical matter, this presumably strengthens the Government's ability to "connect up" its proffered statements to trial evidence regarding the predicate conspiracy. However, the Court also tends to agree with Mr. Avila—at least in part—that given the present posture of this case, the Government's sweeping proffer relating to the conduct of defendants who are not proceeding to trial will, at some point, become of marginal relevance as to Mr. Avila, and will become cumulative, a waste of time, or unduly prejudicial against Mr. Avila as a sole Defendant, contrary to Rule 403. (*See* ECF No. 356 at 2–3.)

In addition, in the Court's view, many of the proffered statements are likely to be more simply admitted on some basis other than Rule 801(d)(2)(E). Notably, five of the named co-defendants to the conspiracy charge are now listed on the parties' disclosed trial witness lists, which the Government obviously did not know would be the case when it made its proffer. (ECF Nos. 350-1 & 351-1.) These likely witnesses include Ms. Lindelien and Raquel Avila, who were among the most frequent recipients of Mr. Murillo's jailhouse phone calls, as well as Ms. Saldana-Rea, who participated in the October 15, 2015 transaction. Other of the proffered "statements" include recorded calls involving the undercover agent, who is expected to testify. In addition, the Court rather strongly expects that among the 44 witnesses the Government has disclosed in this now one-defendant, two-count prosecution (ECF No. 351-1), foundational witnesses from the detention facilities where Mr. Murillo's telephone calls were recorded

will be called to testify.

Given these considerations and the current posture of this case, the Court declines to enter individual rulings under Rule 801(d)(2)(E) as to the remaining 123 proffered statements. Since it is unlikely the Government would actually seek (or be permitted) to introduce *all* of these proffered statements against Mr. Avila, the Court will not pick and choose which of the Government's evidence should form its case against this Defendant, given the developments since the Government made its *James* proffer. The Government will need to carefully review its proffer and evidence and make realistic determinations as to which of the proffered statements it will actually seek to introduce against Mr. Avila pursuant to Rule 801(d)(2)(E), which are more readily offered on some other basis, and at what point the evidence will simply become too cumulative and prejudicial to be admitted in a single-defendant case consistent with Rule 403, even if it is marginally probative of the conspiracy charge against Mr. Avila.

To the extent the Government does seek to introduce additional co-conspirator statements not addressed above, it will need to make an additional proffer to the Court outside the jury's presence as to the admissibility of such evidence under both Rule 801(d)(2)(E) and Rules 401–03. The Court may require the Government to introduce any such statements only *after* introducing sufficient evidence to establish the predicates of Rule 801(d)(2)(E), including the existence of a conspiracy and Mr. Avila's participation in it.

## IV. SUMMARY OF RULINGS

For convenience, the Court summarizes its rulings above as follows:

- The following statements identified in the Government's *James* Proffer (ECF No. 257-1) are provisionally admissible under Rule 801(d)(2)(E):  13, 18, 52–53, 67, 79, 110, 112–113, 116, 119–120, 129 & 138.

- The Court defers ruling on the evidence the Government identified, in aggregate, as statement 71, while noting that the Court finds the actions connected to the October 15, 2015 transaction were made during the course and in furtherance of the predicate conspiracy, so any true co-conspirator statements made in furtherance of that transaction are likely to be admissible under Rule 801(d)(2)(E).

- As to all other statements in the Government's *James* proffer, the Court reserves making any ruling at this time regarding provisional admissibility under Rule 801(d)(2)(E).  To the extent the Government seeks to  introduce additional co-conspirator statements, it will need to make an additional proffer to the Court outside the jury's presence, addressing admissibility under Rule 801(d)(2)(E), as well as under Rules 401–03 in the context of a trial only against Mr. Avila.  The Court may require the Government to introduce any such statements only *after* introducing sufficient evidence to establish the predicates for admission under Rule 801(d)(2)(E), including the existence of a conspiracy and Mr. Avila's participation in it.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Produce Co-Conspirator statements and Request for a

*James* Hearing (ECF No. 248) is DENIED IN PART AS MOOT to the extent the

Government has provided a *James* proffer; is GRANTED IN PART to the extent

the Court has now ruled on that proffer as stated above, and is DENIED IN

PART to the extent Defendant requests a *James* hearing;

2.     The Government's *James* Proffer (ECF No. 257-1) and supporting Brief (ECF

No. 257), jointly construed as a motion for pretrial rulings on the admissibility of

evidence proffered under Federal Rule of Evidence 801(d)(2)(E) is GRANTED IN

PART and DENIED IN PART, as described in detail above.


Dated this 4th day of December, 2017.

BY THE COURT:

_____
William J. Martínez
United States District Judge