# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Criminal Case No. 15-cr-336-7-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

**7.    RICHARD AVILA,**

    Defendant.

---

## ORDER DENYING MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO SUPPRESS EVIDENCE

---

Now before the Court is Defendant's Motion to Dismiss the Indictment Based on Mr. Avila's Constitutional Rights Under the Fifth and Sixth Amendment[s] and *Brady v. Maryland*, 373 U.S. 83 (1963) or in the Alternative to Suppress Evidence as Articulated in the Defense Motion *In Limine* (ECF No. 357), and that portion of Defendant's Motion *In Limine* (ECF No. 356) which seeks to exclude "all evidence that relates to Amado Navidad Sanchez," who is a named co-defendant and remains a fugitive in this drug conspiracy case ("Navidad Sanchez").

Defendant argues that the Government has infringed on his right to a fair trial by improperly procuring Navidad Sanchez's unavailability, thereby depriving Defendant of potentially exculpatory testimony. The Court has received extensive briefing on these motions and held an evidentiary hearing on January 24, 2018. (ECF Nos. 356, 357, 368, 481, 513, 517.) As explained below, the motions are denied because Defendant has not carried the burden of showing the Government acted in bad faith or with

knowledge that Navidad Sanchez possessed evidence helpful to the Defendant.

## I. BACKGROUND

The Court has summarized the factual background of this case in prior orders and does not repeat the detailed background here. Familiarity with the background of this case is presumed. (*See, e.g.*, ECF No. 464.) The documentary evidence and testimony admitted at the evidentiary hearing on January 24, 2018 establishes the facts summarized below.

Defendant Richard Avila ("Defendant" or "Avila") is charged in Count 1 of the Superseding Indictment with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) & 846. (ECF No. 62.)[1] Of the ten Defendants charged as alleged co-conspirators, eight have pled guilty to one or more of the charges filed against them. Navidad Sanchez remains a fugitive, while Avila alone remains set to proceed to trial, and denies that he was a part of the charged drug conspiracy.

Avila first met Navidad Sanchez at the residence of co-defendant Tanya Lindelien (who is the mother of one of Avila's children) in early January 2016. By that time, the Government's investigation of the conspiracy charged in this case was well under way. Law enforcement subsequently observed Navidad Sanchez delivering what they believed to be methamphetamine to Lindelien on at least one occasion, on or around February 14, 2016. Furthermore, DEA agents had established surveillance on

---

[1] Avila is also charged in Count 8 with a single specific instance of distributing methamphetamine on October 15, 2015, but the allegations of that charge are not relevant here.

Navidad Sanchez's vehicle after seeing it at the residence of co-defendant Jesus

Zamora Torres, who was also suspected of trafficking methamphetamine from Arizona

to Colorado as a supplier to Lindelien and other conspirators charged in this case.

The DEA obtained a GPS tracking warrant on February 19, 2016, allowing them

to monitor the location of Navidad Sanchez's mobile phone. Based on this tracking and

other surveillance, law enforcement knew Navidad Sanchez was traveling from Arizona

to Colorado on February 27, 2016. DEA Special Agent Brenna McIntosh caught up

with him northbound on I-25 in the vicinity of Larkspur, Colorado and, working with

another officer (Detective Dompier), followed Navidad Sanchez for approximately 50

miles as he drove to Avila's residence in Commerce City, Colorado. There, Detective

Dompier observed Navidad Sanchez and Avila together in the driveway, then saw

Navidad Sanchez back his vehicle into a fenced area behind Avila's garage, where he

could no longer see what they were doing. Approximately 12 minutes after arriving,

Navidad Sanchez left Avila's residence and drove to Lindelien's residence. He then

returned to Arizona, leaving the Denver area approximately 90 minutes after he first

arrived at Avila's residence.

In late February–early March 2016, Lindelien had a series of communications

with a DEA undercover agent who had previously purchased methamphetamine from

her and was trying to do so again. Lindelien indicated that she would be traveling to

Arizona to obtain a resupply of methamphetamine. However, on March 3, 2016, she

communicated to the undercover agent that, "[m]y person, he has to come out here for

something else . . . that way we can get that one cheaper for you * * * he said he'd bring

me one right now * * * he's going to be here tomorrow or Saturday morning." (ECF No.

257-1 at 140–41.)  This contributed to the DEA's suspicion that Navidad Sanchez would be driving another delivery of methamphetamine from Arizona to Colorado within the next few days.

On March 5, 2016, Navidad Sanchez and Avila exchanged text messages in which Navidad Sanchez asked, "Richard do you need anything?  O not this time,?" to which Avila responded "Yed i will need," and Navidad Sanchez confirmed "Okay I see you on morning, be ready," eliciting an "Ok" from Avila.  (Ex. R at 17 (as in original).)[2] At approximately 3:30 p.m., the GPS data showed Navidad Sanchez northbound from Phoenix on I-17, headed towards Denver.

That evening, the DEA team developed a plan to have local law enforcement in Pueblo, Colorado effect a "wall stop" of Navidad Sanchez as he traveled north towards Denver.  Generally speaking, "[i]n a wall stop, a patrol officer is asked to find his own lawful reason to stop and search the vehicle and is not advised of the information known by investigators in order to protect the secrecy of the ongoing investigation." *United States v. Benard*, 680 F.3d 1206, 1208–09 (10th Cir. 2012).  In this case, another agent working with Special Agent McIntosh (Detective White) made a call to Pueblo Police Department Detective Petkosak, a K-9 and drug interdiction officer.  He was given the description and license plate number of Navidad Sanchez's vehicle and asked to initiate a traffic stop the next day.  In Special Agent McIntosh's words,

---

[2] Law enforcement only obtained these messages after Navidad Sanchez's phone was searched pursuant to a warrant on March 10, 2016.

Detective Petkosak was to "develop his own reasons to stop the vehicle."[3]

As described by Special Agent McIntosh, "five or six" DEA agents and affiliated law enforcement officers in unmarked cars worked together to locate and follow Navidad Sanchez as he passed from New Mexico to Colorado in the early morning of March 6, 2016. These officers trailed and identified Navidad Sanchez but did not stop him. Consistent with the plan developed the night before, Detective Petkosak located Navidad Sanchez's vehicle northbound on I-25. After confirming that the description and license plate number matched the information given him to him by the DEA, Detective Petkosak initiated a pretextual traffic stop of Navidad Sanchez at 5:36 a.m., when he failed to reduce his speed where the speed limit drops from 75mph to 65mph as I-25 passes through the city of Pueblo.

As described in much greater detail by Detective Petkosak's testimony, warrant applications, and his and the DEA's written reports, after stopping Navidad Sanchez, Detective Petkosak obtained his vehicle registration, insurance information, and Mexican passport, as well as identification information for a female passenger and her two young children. The evidence reflects that Navidad Sanchez did not present any driver's license to Detective Petkosak. While dispatch "ran the clearances" on this paperwork (or shortly thereafter), Detective Petkosak asked Navidad Sanchez for permission to conduct a dog sniff of the vehicle using his trained K-9, Widget. When Navidad Sanchez and his female passenger indicated that they would prefer Detective

---

[3] Direct quotations are from testimony at the January 24, 2018 evidentiary hearing, based on the court reporter's unpaginated "rough" transcript, which is available to the Court, as well as the Court's memory of the testimony. Exhibit citations ("Ex.") are to the exhibits admitted at the January 24, 2018 evidentiary hearing. (*See* ECF Nos. 517-1, 517-2, 518.)

Petkosak did *not* conduct a dog sniff, he informed them that the law allowed him to do so anyway.

During the subsequent open air sniff, K-9 Widget alerted, indicating an odor of narcotics. By that time, a Spanish-speaking Pueblo police officer (Sergeant Ortega) had arrived, who asked Navidad Sanchez for consent to search his vehicle. When consent was declined, the officers informed Navidad Sanchez that they would be seeking a search warrant for the vehicle. Eventually Navidad Sanchez consented to have the officers drive his vehicle to a Pueblo police department location.

However, Navidad Sanchez was not detained or questioned. Notwithstanding the DEA's suspicion of major drug trafficking, the positive dog alert, Navidad Sanchez's lack of a driver's license, and Detective Petkosak's observations that he was "visibly nervous," "would not make eye contact," had directed his passenger how to answer a question about their relationship, and had reacted with an audible sigh and dejected demeanor which Detective Petkosak took as "another mental alert that something was with this vehicle" when Navidad Sanchez was informed that the dog sniff would go ahead, neither Pueblo officers nor DEA agents detained or interviewed Navidad Sanchez.

Instead, Sergeant Ortega drove Navidad Sanchez and his passengers to a nearby Loaf n' Jug convenience store. There, he "obtain[ed] . . . a cell phone number so [Detective Petkosak] could call [him] when we were done if nothing was found." Sergeant Ortega then left Navidad Sanchez and his passengers on their own recognizance while Pueblo P.D. sought, and soon obtained, a warrant to search the vehicle. Although the several DEA agents and affiliated officers who had been

6

following Navidad Sanchez all morning were in the area, they did not participate in the traffic stop in any way, and did not put Navidad Sanchez under surveillance, watch where he went, or follow him after he was left at the convenience store. Since his phone was left in the vehicle, the DEA could no longer track him via GPS.

As expected, when Pueblo officers and the DEA searched Navidad Sanchez's vehicle, beginning at around 8:30 a.m., they found a substantial quantity of methamphetamine, specifically, four one pound "bricks," located in the trunk. At that point, Detective Petkosak evidently requested that patrol officers return to the Loaf n' Jug to "look for the parties that they had dropped off." However, Navidad Sanchez and his passengers had by then departed.[4]

Because the DEA's investigation was "an ongoing investigation that [he] didn't want to compromise," and because the DEA had informed the Pueblo officers that no evidence from the federal investigation could be used in any state criminal case against Navidad Sanchez, none of Detective Petkosak's reports, warrant applications, or supporting affidavits mention in any way that the traffic stop was pretextual and conducted based on the DEA's request. To the contrary, Detective Petkosak's written report represents, falsely and misleadingly, that the traffic stop of Navidad Sanchez was the result of a "random patrol," rather than the result of a targeted "wall stop." (Ex. T at 3.)

On March 10, 2016, Detective Petkosak called Special Agent McIntosh to ask "if we could issue a warrant [for Navidad Sanchez's arrest] without messing up their

---

[4] The officers evidently learned from the convenience store clerk that Navidad Sanchez and his passengers went to a nearby hotel, and learned from the hotel clerk that when no room was available, they left in a taxi cab headed towards Castle Rock, Colorado.

[federal] investigation." He testified that he wanted to pursue a warrant and state criminal case "to show the public that the K-9 unit is active and intercepting narcotics on the highway," and in particular that he "wanted to get the publicity" for K-9 Widget, but could only do so with active criminal charges. Special Agent McIntosh approved Detective Petkosak's request, and Detective Petkosak applied for an arrest warrant the same day, again representing to the court in Pueblo that his stop of Navidad Sanchez had been the result of a "random patrol," while omitting any mention of the DEA's involvement. (Ex. Y.)[5] The District Attorney in Pueblo filed charges against Navidad Sanchez (*see* Ex. Z), and thereafter several news stories reporting the drug seizure ran in local and regional outlets.[6] In addition to crediting K-9 Widget and seeking tips on Navidad Sanchez's whereabouts, one of these stories quoted another Pueblo officer as stating, again falsely and misleadingly, that "[t]he narcotics officer just so happened to make a stop on the vehicle," *KOAA, supra*, while another reported that Navidad Sanchez "managed to get away," *KRDO, supra*.

---

[5] A supplemental report regarding the vehicle search prepared by another Pueblo officer on March 14, 2016 more candidly indicates that "DEA agents" were involved with the vehicle search, but this appears to be the only place in the state court records where the DEA's involvement in the events of March 6, 2016 was acknowledged. (Ex. T at 11.)

[6] *See, e.g. Pueblo police seize meth in drug trafficking bust,* KOAA News5, Mar. 15, 2016 (available at http://www.koaa.com/story/31480560/pueblo-police-seize-meth-in-drug-trafficking-bust) ("*KOAA*"); Mallory Davis, *K-9 search leads to seizure of over $200k of meth*, 9News.com, Mar. 15, 2016 (available at http://www.9news.com/article/news/crime/k-9-search-leads-to-seizure-of-over-200k-of-meth/73-83659459); Kelly Helton, *A quarter million dollars' worth of meth found during traffic stop*, FOX21NEWS, Mar. 15, 2016 (available at http://www.fox21news.com/news/a-quarter-million-dollars-worth-of-meth-found-during-traffic-stop/837557597) (all URLs last visited Jan. 29, 2018); Chris Loveless, *Police: K-9 sniffs out nearly $225,000 worth of meth during traffic stop*, NEW Channel 13, Mar. 15, 2016 (available at http://www.krdo.com/news/archive/police-k-9-sniffs-out-nearly-225000-worth-of-meth-during-traffic-stop-/35530088) ("*KRDO*").

Navidad Sanchez was then indicted in this case on June 8, 2016. A federal warrant for his arrest was issued at that time.[7] He remains a fugitive and, at least so far as the Court has been made aware, has had no contact with law enforcement since the events of March 6, 2016.

In his present Motions and via his own testimony, Avila maintains that his dealings with Navidad Sanchez had nothing to do with drugs, and that if Navidad Sanchez were to testify, he would contradict the Government's allegations against Avila. Specifically, Avila testified that he met Navidad Sanchez at Lindelien's house only by coincidence when retrieving his belongings after they had broken up. He testified that he and Navidad Sanchez struck up a conversation regarding cars, and particularly car audio equipment, because Navidad Sanchez admired Avila's car and audio system. Avila has considerable experience and expertise with customizing cars and installing car audio systems, and, according to Avila, he reached an agreement with Navidad Sanchez to install certain audio equipment in his vehicle. Avila acknowledged that he suspected that Navidad Sanchez was trafficking drugs with Lindelien, but maintains that his own dealings with Navidad Sanchez, including their meeting on February 27, 2016, were exclusively related to work he expected to do on Navidad Sanchez's car, which Avila described in considerable detail at the hearing.

## II.  APPLICABLE LAW

Avila argues that the Government's failure to detain or even interview Navidad Sanchez at the time of the March 6, 2016 traffic stop, combined with its subsequent

---

[7] The state criminal charges filed in Pueblo were dismissed shortly after Navidad Sanchez was indicted in this case. (Ex. Z.)

prosecution and indictment of him amounts to the Government having "recklessly procured Mr. Sanchez's unavailability" and "improperly interfered with defense access to material evidence and the ability to present any defense to evidence related to Mr. Sanchez." (ECF No. 357 at 7.) He argues that the Government's conduct violated his rights under the Fifth and Sixth Amendments to present a defense, to due process and to compulsory process, and also violated the Government's obligations under *Brady*.

Neither party has cited any case presenting exactly similar facts, that is, where Government agents had the opportunity to detain and interview a suspect but did not do so, permitted the suspect to go free, but later prosecuted him, thus contributing to his unavailability as a witness for another co-defendant. However, numerous cases have addressed analogous problems, which arise in "what might loosely be called the area of constitutionally guaranteed access to evidence." *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).

Past cases have, for example addressed: facts where the Government failed to promptly perform forensic tests on evidence or to properly store it, such that later tests were inconclusive, *Youngblood*, 488 U.S. at 54–55; cases in which a judge or prosecutor improperly discourages a witness from testifying in favor of a defendant, *Webb v. Texas*, 409 U.S. 95, 97–98 (1972), or where the judge or prosecutor improperly interferes with such a witness's decision to invoke the privilege against self-incrimination, *United States v. Serrano*, 406 F.3d 1208, 1213–14 (10th Cir. 2005); cases where law enforcement conceals a defense witness or otherwise makes him or her unavailable, *Freeman v. Georgia*, 599 F.2d 65, 68 (5th Cir. 1979); and cases where

the prosecution threatens a potential witness with additional charges or other

consequences for testifying in a defendant's favor, *see, e.g., Bray v. Peyton*, 429 F.2d

500 (4th Cir. 1970), *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998), and

*United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992).

These analogous cases establish general legal principles that apply here:

> A criminal defendant's right to present a defense is essential to a fair trial. The Fifth . . . and Sixth Amendments concomitantly provide a criminal defendant the right to present a defense by compelling the attendance, and presenting the testimony, of his own witnesses. The Supreme Court's broad reading of the Sixth Amendment's Compulsory Process Clause, establishes, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt. Likewise, the necessary ingredients of the Fifth . . . Amendmen[t] guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony.
>
> A defendant's right to present a defense, however, is not absolute. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. For example, the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The right to present a defense, as a result, does not displace traditional testimonial privileges. * * * Several courts of appeal, therefore, have held a defendant's right to present a defense does not include the right to compel a witness to waive his Fifth Amendment privilege against self incrimination.
>
> That said, the government cannot substantially interfere with a defense witness's decision to testify.

*Serrano*, 406 F.3d at 1214–15 (ellipses added; citations and internal quotation marks

omitted).

The central inquiry in such cases may be specific to particular alleged

misconduct, such as "[i]f the states deliberately conceals an eyewitness," *Freeman,* 599

F.2d at 69. More generally the issue is whether "the state artificially restricted the

defendant's ability to obtain evidence," *Agostino*, 132 F.3d at 1191, or "whether the

government actor's interference with a witness's decision to testify was 'substantial,'"

*Serrano*, 406 F.3d at 1214.

In addition, a related line of cases has applied these constitutional principles

where the Government deports a potential defense witness (or facilitates their voluntary

departure from the country). *See, e.g.*, *Valenzuela-Bernal*, 458 U.S. 858; *United States

v. Gonzalez-Perez*, 573 F. App'x 771, 776 (10th Cir. 2014). In these analogous cases,

"[t]o obtain an order dismissing his indictment, the burden is on the [defendant] to show

that: (1) the government acted in bad faith by allowing a witness with potentially

exculpatory information to depart; and (2) the voluntary departure of the absent witness

prejudiced him by eliminating testimonial evidence that 'would be both material and

favorable to the defense.'" *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir.

1997).

The determination of bad faith, "'must necessarily turn on the police's knowledge

of the exculpatory value of the evidence at the time it was lost or destroyed.'

Negligence is not enough to establish bad faith. There must be (1) willful conduct

motivated by a desire to obtain a tactical advantage over the defense or (2) a departure

from the government's normal deportation procedures." *Gonzalez-Perez*, 573 F. App'x

at 776 (quoting *Youngblood*, 488 U.S. at 56 and citing *California v. Trombetta*, 467 U.S.

479, 488 (1984)).  The consideration of prejudice arising from the unavailability of favorable evidence requires "more than the mere potential for favorable testimony." *Iribe-Perez*, 129 F.3d at 1173 (citing *Valenzuela-Bernal*, 458 U.S. at 873).

Synthesizing this case law and applying it to the facts presented here, the Court concludes that Avila would likewise need to make two showings to prevail on his present motions.  *First*, a showing of bad faith by the Government actors is required, since the Supreme Court's decisions in this area have "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government."  *Youngblood*, 488 U.S. at 57.  *Second*, Avila must make a showing that Navidad Sanchez's testimony would have been material and favorable to his defense, such that he is prejudiced by Navidad Sanchez's unavailability as a witness.  *See Valenzuela-Bernal*, 458 U.S. at 867 (a defendant "must at least make some plausible showing of how [an absent witness's] testimony would have been both material and favorable to the defense").  *Accord United States v. Barajas-Chavez*, 358 F.3d 1263, (10th Cir. 2004) ("[A] district court is only required to dismiss a defendant's indictment because of the departure of potential witnesses when the defendant shows that (1) the government acted in bad faith by allowing a witness with potentially exculpatory information to depart; and (2) the voluntary departure of the absent witness prejudiced him by eliminating testimonial evidence that would be both material and favorable to the defense."  (internal quotation marks omitted)).

# III. ANALYSIS

The Court agrees with Defendant that the decision to permit Navidad Sanchez to go free on March 6, 2016 is perplexing. The Court also finds that Government's explanation leaves much to be desired. Special Agent McIntosh testified that she chose not to detain or interview Navidad Sanchez in order to continue her investigation, but offered little explanation of *why* she made that decision or why it made sense, particularly given the resources already committed to tracking Navidad Sanchez and her suspicion that he was trafficking methamphetamine. Her vague testimony that "[i]t was not the right time on March 6th," does not seem to acknowledge, even in hindsight, that this has now proved to be the *only* time the Government had the opportunity to apprehend or question Navidad Sanchez.

The decision to permit state criminal charges against Navidad Sanchez and related publicity also seriously undercuts the implied claim that law enforcement allowed him to go free in order to advance their investigation of other suspects. Moreover, Special Agent McIntosh acknowledged that the investigation did not lead to charges against any other persons identified after March 6, 2016.

In addition, the Pueblo officers' approach to the March 6, 2016 stop is out of step with what one ordinarily expects under controlling Fourth Amendment law. It is unclear why the Pueblo officers sought a search warrant (at roughly 6 a.m. on a Sunday morning, no less), or that they needed to, unless perhaps to facilitate the DEA's participation in the vehicle search. Generally, "a positive dog alert gives officers probable cause to search" a vehicle, without further requiring a warrant, *United States*

14

*v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009), and this has been the law in the Tenth

Circuit for over 25 years, *see United State v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir.

1993) (citing earlier cases).[8]

Similarly, Detective Petkosak testified that despite the DEA's tip of likely drug

trafficking, the positive dog sniff, and his own observations regarding Navidad

Sanchez's conduct and demeanor, he "did not have reason to detain [Navidad

Sanchez]," that he was "free to leave," and that he believed he had probable cause *only*

to seek a search warrant, but not to detain or question Navidad Sanchez. This

surprising view by an experienced police detective only evades the more relevant

question of whether there was reasonable suspicion of criminal activity sufficient to

justify an investigative detention of Navidad Sanchez. The answer to *that* question is

almost certainly "yes."[9] The Court has no doubt that the Government would argue,

successfully, that the facts presented would be sufficient to justify detention in any other

case.

While the Court cannot fault Pueblo officers for taking a conservative, "belt and

suspenders" approach to Navidad Sanchez's Fourth Amendment rights, the

---

[8] *See also United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) ("It is well established that a canine alert provides probable cause to search a vehicle. This is so even when the dog alert occurs during a warrantless sniff on the exterior of a vehicle during a lawful traffic stop because such sniffs do not implicate the Fourth Amendment. Once an officer has probable cause to search a vehicle, the officer is empowered to search the entire vehicle, including the trunk." (alterations incorporated, citations and internal quotation marks omitted)).

[9] *Cf. United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) ("Reasonable suspicion is not, and is not meant to be, an onerous standard. Moore's nervousness, his admission that he had been in trouble before, and the recent addition of his name to the vehicle's registration, when considered together, are sufficient to indicate criminal activity."); *United States v. Guerrero-Sanchez*, 412 F. App'x 133, 139 (10th Cir. 2011) ("reasonable suspicion may arise from the 'totality of the circumstances'").

circumstances beg the question of whether these unnecessary and somewhat surprising actions were "in accord with . . . normal practice," or were "a departure from the government's normal . . . procedures." *Gonzalez-Perez*, 573 F. App'x at 776.[10]

Nevertheless, although the hearing testimony did not fully resolve these concerns or illuminate all of law enforcement's decisions, the evidence and testimony broadly reflected that the Pueblo police department and DEA were acting in their discretion and within permissible norms of how vehicle stops and searches are conducted and how complex undercover drug investigations may be advanced. The relevant inquiry here is not for the Court to second-guess investigative decisions, and Avila has not identified any authority that *required* law enforcement to detain or question Navidad Sanchez, or reflecting that the actions here amounted to misconduct.

Despite the lack of a clear explanation for why Navidad Sanchez was allowed to go free, the law places the burden on Avila to show the Government acted in bad faith, *Youngblood*, 488 U.S. at 57, and he has not carried that burden, primarily because there has been no claim or showing that the Government knew, as of March 6, 2016, that Navidad Sanchez might provide exculpatory testimony favorable to Avila.

Avila testified that the first time he informed the Government of what he believes Navidad Sanchez's testimony would be was at the January 24, 2018 evidentiary

---

[10] The hearing testimony did not fully illuminate why Detective Petkosak and his fellow officers proceeded as they did, or whether they acted, in part, to facilitate the DEA's surreptitious involvement. Detective Petkosak testified that for safety reasons, in a search by consent he usually moves a vehicle off the highway. But this is at most tangential to the question of whether a warrant or consent were required, given the dog alert. *Moore*, 795 F.3d at 1231; *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261 (10th Cir. 2006) (consent to move vehicle unnecessary where warrantless search was supported by probable cause).

16

hearing, more than two years after the events in question.  This stands in contrast to the deportation cases (such as *Valenzuela-Bernal*, *Iribe-Perez*, and *Gonzalez-Perez*), in which law enforcement or prosecutors have generally communicated with potential witnesses to determine whether their testimony is sufficiently exculpatory that they may not be deported before a trial where they might be a witness.

The facts here also contrast with the witness interference cases in which the relevant misconduct occurs *after* the individual has been identified in some fashion as a potential or expected defense witness.  Here, law enforcement was dealing with Navidad Sanchez principally as a suspect, not as a potential witness.  Even assuming his communications with Avila might have given the Government reason to believe that Navidad Sanchez would be a central figure in the case against Avila, law enforcement only obtained those communication records *after* March 6, 2016.  *See supra*, note 2. Because law enforcement had no knowledge of what testimony he might, even hypothetically, have to offer, and was dealing with Navidad Sanchez as a suspect, not a witness, the Court cannot find that the Government either "artificially restricted" Avila's access to favorable testimony or "substantially interfered" with Navidad Sanchez's decision to testify.  *Agostino*, 132 F.3d at 1191; *Serrano*, 406 F.3d at 1214.

Fatally to Avila's argument, the Government's lack of knowledge regarding Navidad Sanchez's possible testimony means that Avila has not shown bad faith.  *See Youngblood*, 488 U.S. at 56, n.* ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or

destroyed."); *Gonzalez-Perez*, 573 F. App'x at 776 (same).

Beyond that, the Court finds it doubtful that showing either that law enforcement was "motivated by a desire to obtain a tactical advantage over the defense," or that it "depart[ed] from . . . normal . . procedures," *Gonzalez-Perez*, 573 F. App'x at 776, could by itself establish bad faith when the Government was unaware of the exculpatory value of evidence at the time it was lost or destroyed. *Youngblood*, 488 U.S. at 56, n.*. And, in any event, Avila has also failed to make a sufficient showing on these issues to prevail.

To the extent Navidad Sanchez's release was meant to advance the criminal investigation in a general fashion, that is distinguishable from the kind of "tactical advantage" sought during prosecution or in advance of trial which is contemplated in the relevant case law. *See Serrano*, 406 F.3d at 1212, n.1 (addressing claim of dissuading witness testimony "to gain a tactical advantage *at trial*" (emphasis added)). As above, this case is unlike those where a claim of witness interference arises *after* the individual is identified as a defense witness. *See, e.g.*, *Bray,* 429 F.2d 500; *Vavages*, 151 F.3d at 1188; *Davis*, 974 F.2d at 187.

As to any departure from normal procedures, although the Court has already expressed some skepticism as to the Government's explanations, the overall evidence and testimony establish that this was a deliberate decision, taken during the course of an ongoing undercover investigation which the DEA wished to conceal and advance. To the extent the Government had other undisclosed motivations, there is no indication that those included harming Avila's case. Neither the evidence nor any legal authority

shows that law enforcement was required to apprehend and interview Navidad Sanchez before they chose to do so. To the extent their decision appears in hindsight to have been a substantial tactical error, such a mistake is not sufficient to establish bad faith. *Gonzalez-Perez*, 573 F. App'x at 776 ("Negligence is not enough to establish bad faith.").[11]

As to Avila's alternative request to suppress evidence related to Navidad Sanchez, he has not shown that law enforcement's conduct was illegal, or a violation of his constitutional rights. Thus, suppression or exclusion of evidence is not warranted. *See, e.g., Davis v. United States*, 564 U.S. 229, 239 (2011) (isolated police negligence "lacks the culpability required to justify the harsh sanction of exclusion"). Lastly, Avila's argument under *Brady* also must fail, since the Government cannot have suppressed evidence of which it was unaware.

## IV. CONCLUSION

For the reasons set forth above, Defendant Richard Avila's Motion to Dismiss the Indictment Based on Mr. Avila's Constitutional Rights Under the Fifth and Sixth Amendment[s] and *Brady v. Maryland*, 373 U.S. 83 (1963) or in the Alternative to

---

[11] The implementation of the "wall stop" may raise separate concerns. The testimony tended to show that law enforcement officers (here, in particular, Detective Petkosak) somewhat routinely omit or misrepresent the actual origins of their evidence when seeking warrants or pursuing charges that originate from pretextual traffic stops. This would make it impossible for a defendant in Navidad Sanchez's position to discover or challenge any illegality in how the evidence against him was actually procured. In addition, the assumption that an officer can reliably "develop his own probable cause" for any identified target tends to suggest that it is a foregone conclusion that law enforcement can come up with reasons to stop virtually any vehicle on the road at any time. This seems to reduce the articulation of probable cause to an exercise in gamesmanship, rather than an objective constitutional safeguard, and is highly troubling to this Court. However, these concerns do not implicate Avila's constitutional rights here, where the basis for the traffic stop is known and its legality is not challenged.

Suppress Evidence as Articulated in the Defense Motion *In Limine* (ECF No. 357) is

DENIED, as is that portion of Defendant's Motion *In Limine* (ECF No. 356) which seeks

to exclude "all evidence that relates to Amado Navidad Sanchez."

Dated this 31st day of January, 2018.

BY THE COURT:

_____
William J. Martínez
United States District Judge